**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

UNITED STATES OF AMERICA )
)
v. ) No. 99CR00024-01
) 1:03Mc00056
ARTHUR D'AMARIO )

**MEMORANDUM OF LAW AND AUTHORITIES**

Comes now the United States of America, by and through its attorneys, Robert Clark Corrente, United States Attorney, and Adi Goldstein, Assistant U.S. Attorney, and submits the within Memorandum of Law and Authorities on the issue of whether the District Court had jurisdiction to modify the conditions of Defendant's supervised release while the matter was pending on appeal.

For the reasons set forth in the Brief for the Appellant, United States of America, attached here as Exhibit 1, the Government believes that the District Court did in fact have jurisdiction to modify Defendant's sentence. The Government has requested that the First Circuit expedite its decision on this issue in light of this Court's inclination to consider the jurisdictional question de novo. A copy of the United States' Emergency Motion for Expedited Appeal is attached here as Exhibit 2. The government would also note that, at the June 8 oral argument, there was clear indication that the First Circuit panel was not impressed with Defendant's jurisdictional claim. In

light of the oral argument, and the strength of the position outlined in the government's brief, there is every reason to believe that the Court of Appeals will reject that claim.

In light of the foregoing, the government respectfully requests that the Court deny Defendant's Objection to the supervised release violation, or in the alternative, withhold decision until the First Circuit has issued its ruling.

Respectfully Submitted,

The United States of America

By its attorneys:

ROBERT CLARK CORRENTE
United States Attorney

ADI GOLDSTEIN
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of June, 2005, I served by first class mail, postage prepaid, a copy of the within Memorandum, to the following:

Charles A. Tamulevitz, Esq.
144 Westminster Street
Providence, RI 02903

Barry Weiner
Chief U.S. Probation Officer
U.S. Probation Office
3rd Floor, West Pavilion Building
36 Exchange Terrace
Providence, RI 02903-1743

[signature]

No. 04-2566

UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,
Appellee,

v.

ARTHUR D'AMARIO, III,
Defendant-Appellant.

ON APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

# BRIEF FOR THE APPELLEE,
# UNITED STATES OF AMERICA

ROBERT CLARK CORRENTE
United States Attorney

DONALD C. LOCKHART
Bar No. 62470
ADI GOLDSTEIN
Assistant United States Attorneys
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
Tele: (401) 709-5000

May 2, 2005

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . i

I. STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . 2

A. Introduction . . . . . . . . . . . . . . . . . . . . . 2

B. The District of Rhode Island Case . . . . . . . . . . 2

C. The District of New Jersey Case . . . . . . . . . . . 3

D. The Earlier Supervised Release Revocation Proceeding . . . . . . . . . . . . . . . . 3

E. The Modification of Supervised Release Conditions . . . . . . . . . . . . . . . . . 6

F. Subsequent Events . . . . . . . . . . . . . . . . . . 9

III. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . 10

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 11

A. THE DISTRICT COURT HAD JURISDICTION TO MODIFY THE TERMS OF SUPERVISED RELEASE . . . . . . . 11

B. THE DISTRICT COURT DID NOT PLAINLY ERR OR ABUSE ITS DISCRETION IN ORDERING COMMUNITY CONFINEMENT . . . . . . . . . . . . . . . . . 19

1. The Statute Authorized Community Confinement . . . . . . . . . . . . . 19

2. Community Confinement was Reasonable in this Case . . . . . . . . . . . 27

**Page**

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . 33

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . 33

**ADDENDUM**

Report and Recommendation, July 16, 2003, CR 99-024ML (RI), CR 99-30-01M (NH) . . . . . . . . . . . . . . 1

Order, November 9, 2004, CR. No. 99-024-01S . . . . . . . . . . . . . . . . . . . . 14

Motion to Modify Supervised Release Terms, December 15, 2004; Order Denying Motion, January 12, 2005, No. CR 99-024S . . . . . . . . . . . . . . 15

Order, January 13, 2005 CR No 99-024S . . . . . . . . . . . . . . . . . . . . . . 16

Order, April 12, 2005, CA04-328S (RI); Concurring Order, 05-ds-142-PB (NH) . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES

Page

**CASES**


Benton v. Ashcroft, 273 F. Supp.2d 1139 (S.D. Cal. 2003) . . 20

Crown Construction Co. v. Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor, 887 F.2d 149 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . 25

Gozlon-Peretz v. United States, 498 U.S. 395 (1991) . . . . . . 22

Griggs v. Provident Consumer Discount Co., 459 U.S. 56 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 15

Hassett v. Welch, 303 U.S. 303 (1938) . . . . . . . . . . . . . . 24

Johnson v. United States, 520 U.S. 461 (1997) . . . . . . . . . 21

Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524 (1838) . . . . . . . . . . . . . . . . . . . 24

Loeffler v. Menifee, 326 F. Supp.2d 454 (S.D.N.Y. 2004) . . . 20

Munoz v. Porto Rico Ry. Light & Power Co., 83 F.3d 262 (1st Cir. 1936) . . . . . . . . . . . . . . . . . . . . 24

United States v. Bahe, 201 F.3d 1124 (9th Cir. 2000) . . . . . . . . . . . . . . . . . 20, 21, 23, 25, 26

United States v. Barrett, 198 F. Supp.2d 1046 (S.D. Iowa 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Bermudez-Plaza, 221 F.3d 231 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 12, 32

United States v. Brooks, 145 F.3d 446 (1st Cir. 1998) . . 14, 15

United States v. Cheal, 389 F.3d 35 (1st Cir. 2004) . . . . . . 23

United States v. Crea, 968 F. Supp. 826 (E.D.N.Y. 1997) . . . 11

United States v. D'Amario, 2 Fed. Appx. 25 (1st Cir. Feb. 12, 2001) . . . . . . . . . . . . . . . . . . . . . . 2

United States v. D'Amario, 350 F.3d 348 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Diaz, 285 F.3d 92 (1st Cir. 2002) . . . . . . 21

United States v. DiStasio, 820 F.2d 20 (1st Cir. 1987) . . . 16

United States v. Duarte, 246 F.3d 56 (1st Cir. 2001) . . . . 19

United States v. Gilberg, 75 F.3d 15 (1st Cir. 1996) . . . . 21

United States v. Griner, 358 F.3d 979 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . 20, 21, 23-26

United States v. Hurley, 63 F.3d 1 (1st Cir. 1995) . . . . . . 13

United States v. Lowenstein, 108 F.3d 80 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Mandarelli, 982 F.2d 11 (1st Cir. 1992) . . 22

United States v. Melendez-Santana, 353 F.3d 93 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Meyers, 95 F.3d 1475 (10th Cir. 1996) . . . 13

United States v. Mills, 186 F. Supp.2d 965 (E.D. Wis. 2002) . . . . . . . . . . . . . . . . . . . 20, 26, 27

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . 21

United States v. Padilla, 393 F.3d 256 (1st Cir. 2004), rehearing en banc granted, 2005 WL 789424 (1st Cir. Mar. 15, 2005), opinion vacated, 2005 WL 789505 (1st Cir. Apr. 7, 2005) . . . . . . . . . . 20

United States v. Phelps, 283 F.3d 1176 (9th Cir. 2002) . . . . 13

United States v. Ransom, 866 F.2d 674 (2d Cir. 1989) . . . . 16

United States v. Turkette, 452 U.S. 576 (1981) . . . . . . . . 13

United States v. Vanhorn, 296 F.3d 713 (8th Cir. 2002) . . . 13

United States v. Weiner, 3 F.3d 17 (1st Cir. 1993) . . . . . . 21

United States v. Whab, 355 F.3d 155 (2d Cir.), cert. denied, 124 S. Ct. 2055 (2004) . . . . . . . . . . . . 21

United States v. York, 357 F.3d 14 (1st Cir. 2004) . . . . . 27-30

**STATUTES**

18 U.S.C. § 115(a)(1)(B) . . . . . . . . . . . . . . . . . . . . 3
18 U.S.C. § 922(g) . . . . . . . . . . . . . . . . . . . . 2, 3
18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . 28
18 U.S.C. § 3553(a)(1) . . . . . . . . . . . . . . . . . 28, 29
18 U.S.C. § 3553(a)(2)(B) . . . . . . . . . . . . . . . 28, 29
18 U.S.C. § 3553(a)(2)(C) . . . . . . . . . . . . . . . 28, 29
18 U.S.C. § 3553(a)(2)(D) . . . . . . . . . . . . . . . 28, 29
18 U.S.C. § 3563 . . . . . . . . . . . . . . . . . . . 22, 25
18 U.S.C. § 3563(b) . . . . . . . . . . . . . . . . . . 23-25
18 U.S.C. § 3563(b)(1)-(b)(10) . . . . . . . . . . . . . . 22
18 U.S.C. § 3563(b)(11) . . . . . . . . . . . . . . 23, 26, 27
18 U.S.C. § 3563(b)(12) . . . . . . . . . . . . 22, 23, 26, 27
18 U.S.C. § 3563(b)(12)-(b)(19) . . . . . . . . . . . . . 22
18 U.S.C. § 3582(c) . . . . . . . . . . . . . . . . . . . 12
18 U.S.C. § 3583(d) . . . . . . . . . . . . 19, 20, 22-27, 32
18 U.S.C. § 3583(d)(1)-(3) . . . . . . . . . . . . . . 27, 28
18 U.S.C. § 3583(d)(2) . . . . . . . . . . . . . . . . . . 29
18 U.S.C. § 3583(e)(2) . . . . . . . . . . . . . 10-12, 16, 17
18 U.S.C. § 3583(e)(3) . . . . . . . . . . . . . . . . . . 18
18 U.S.C. § 3583(i) . . . . . . . . . . . . . . . . . . . 16
18 U.S.C. § 3605 . . . . . . . . . . . . . . . . . . . . . 4
18 U.S.C. § 4243(f) . . . . . . . . . . . . . . . . . . . 13
28 U.S.C. § 994(a) . . . . . . . . . . . . . . . . . . . . 28

**RULES**

Fed. R. Crim. P. 32.1(c) . . . . . . . . . . . . . . . . 10, 11

Fed. R. Crim. P. 33(b)(1) . . . . . . . . . . . . . . . 12, 17

Fed. R. Crim. P. 35(b) . . . . . . . . . . . . . . . . 16, 17

Fed. R. Crim. P. 52(b) . . . . . . . . . . . . . . . . . . 21

**SENTENCING GUIDELINES**

USSG § 5D1.3 . . . . . . . . . . . . . . . . . . . . . . 28

USSG § 5D1.3(e)(1) . . . . . . . . . . . . . . . . . . . 20

USSG § 5F1.1 . . . . . . . . . . . . . . . . . . . . 20, 28

**OTHER AUTHORITIES**

2 Sutherland on Statutory Construction,
787-88 (2d ed. 1904) . . . . . . . . . . . . . . . . . . . 24

## I. STATEMENT OF THE ISSUES

1. Whether the district court was divested of jurisdiction to modify the conditions of supervised release during the pendency of defendant's various appeals (several of which remain undecided to this day), making the court powerless to address defendant's stated intention to violate the terms of supervised release once released from prison.

2. Whether it is "plain" or "obvious" for purposes of plain-error review that the supervised release statute does not authorize community confinement, where two circuits have expressly held that the statute does authorize such a condition of supervised release, no circuits disagree, and this Court has never addressed the question.

3. Whether the district court committed plain error or abused its discretion in ruling that community confinement was warranted based on the facts of the case, where defendant had threatened acts of violence and had stated an intent to violate the terms of supervised release.

## II. STATEMENT OF THE CASE

### A. Introduction

The full procedural history of Arthur D'Amario's District of Rhode Island conviction for possessing a firearm as a convicted felon, his District of New Jersey conviction for threatening to kill the sentencing judge, his related civil lawsuits, and his numerous First, Third, and Eighth Circuit appeals, is too lengthy to set forth in any detail.[1] The key procedural facts are these.

### B. The District of Rhode Island Case

In 1999 a District of Rhode Island grand jury charged D'Amario with possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g). United States v. D'Amario, 2 Fed. Appx. 25, 27 (1st Cir. Feb. 12, 2001) (per curiam). After all three judges in the district recused themselves, the case was assigned to Judge Joseph A. DiClerico, Jr. of the District of New Hampshire. Id. at 25. A jury convicted D'Amario following a two-day trial. The court sentenced him to 18 months in prison, to be followed by three years of supervised release. Id. at 28.

This Court affirmed D'Amario's conviction and sentence in 2001. D'Amario, 2 Fed. Appx. at 29. Since that time, D'Amario has filed numerous additional appeals, some of which are still pending.

---

[1] D'Amario has filed approximately forty appeals in this Court and roughly thirty appeals in the Third and Eighth Circuits. He has also filed dozens of lawsuits in district courts around the country. See PACER, National Index, U.S. Party/Case Index.

C. <u>The District of New Jersey Case</u>

While serving his prison term for the § 922(g) conviction, D'Amario wrote a letter in which he threatened to kill Judge DiClerico, among others. <u>United States v. D'Amario</u>, 350 F.3d 348, 350-52 (3d Cir. 2003). On December 4, 2001, a jury in the District of New Jersey convicted D'Amario of threatening to kill a federal judge, in violation of 18 U.S.C. § 115(a)(1)(B). <u>D'Amario</u>, 350 F.3d at 353. After granting D'Amario a downward departure, the court sentenced him to 21 months in prison, to be followed by three years of supervised release. <u>Id.</u> at 353-55.

The government appealed the departure ruling. On November 20, 2003, the Third Circuit reversed and remanded with instructions that the court impose a sentence in the range of 30-37 months. <u>D'Amario</u>, 350 F.3d at 355-60. On April 22, 2004, D'Amario was sentenced to 30 months in prison (nine additional months). (District of New Jersey Case No. 1:01-Cr-00346, Docket Nos. 170 & 171.)

D. <u>The Earlier Supervised Release Revocation Proceeding</u>

On April 29, 2003, while the government's Third Circuit appeal was pending, D'Amario was released from a halfway house in Arizona. (Addendum at 2-4 & 6.) At that point he began serving the terms of supervised release imposed in the District of Rhode Island and District of New Jersey cases. (Addendum at 6.)

The District of New Jersey judge transferred jurisdiction over supervised release to the District of Rhode Island, pursuant to 18 U.S.C. § 3605, thus consolidating all supervised release matters in that court. (Addendum at 6 & 9; District of Rhode Island Case No. 03-ML-56, Docket No. 1; 11/9/04 Transcript at 5-6.) At the time, Judge Steven J. McAuliffe of the District of New Hampshire presided over the case, Judge DiClerico having recused himself.

On June 2, 2003, D'Amario was arrested in New Jersey for violating the terms of his supervised release. (Addendum at 6; 11/9/04 Transcript at 6.)

Following a preliminary hearing held in the District of Rhode Island, a Magistrate Judge determined that D'Amario had violated four of the conditions of supervised release imposed in the District of Rhode Island and District of New Jersey cases. (Addendum at 9-10.) On July 17, 2003, the Judge issued a 13-page report recommending that D'Amario be sentenced to concurrent sentences of 11 months in prison, to be followed by 25 months of supervised release. (Addendum at 1-13.)

On August 27, 2003, Judge McAuliffe recused himself and the case was reassigned to Judge William E. Smith of the District of Rhode Island. (Docket No. 309.)

At a hearing held before the district court (Smith, J.) on September 30, 2003, the court accepted the Magistrate Judge's report and imposed the recommended sentence. One of the conditions

of the 25-month term of supervised release was that D'Amario was prohibited from traveling to Rhode Island without prior permission of the Probation Office and the court. (11/9/04 Transcript at 7.) The court later explained that it had imposed that condition "because [D'Amario] has engaged in such a campaign of threats and harassment of so many different people in Rhode Island that I felt there was no other way to really effectively protect and assure myself about the public safety issues associated with him once he was released unless I could put some type of parameter that would effectively deal with it." (Ibid. at 16.)

The September 30, 2003 order and D'Amario's ancillary motions (see Docket Nos. 313-380) have generated several appeals, including the appeals in Case Nos. 03-2638 and 04-1205, both of which are pending. In No. 04-1205, the government responded to D'Amario's claim that the condition prohibiting travel to Rhode Island absent prior approval amounts to unlawful banishment, pointing out that the condition is authorized by statute and consistent with the case law. (4/9/04 Memorandum in Support of Motion for Summary Disposition at 6-8.) That condition is not contested in this appeal.[2]

---

[2] Notwithstanding the order transferring the District of New Jersey case to the District of Rhode Island, D'Amario recently attacked his supervised release in the District of New Jersey (District of New Jersey Case No. 1:01-Cr-00346, Docket No. 181) and in the Third Circuit (Case No. 05-1708).

### E. The Modification of Supervised Release Conditions

D'Amario was due to complete his 11-month prison term on November 12, 2004. After his release he was to begin serving the 25-month term of supervised release.

Based on evidence that D'Amario had threatened acts of violence while in prison and that he intended to return to Rhode Island in violation of the September 30, 2003 order upon his release, the district court (Smith, J.) appointed counsel for him and convened a hearing on its own motion shortly before his release date. (11/9/04 Transcript at 3-8, 12, 16-18.) Rather than simply wait for D'Amario to commit such a violation, the judge decided it would be more productive to explore at a hearing possible supervised release options that would address his concerns while increasing the odds of D'Amario's compliance. (Ibid. at 8.)

The hearing took place on November 9, 2004, a few days before D'Amario's release date. After the court explained the purpose of the hearing, D'Amario's counsel objected to the court's authority to hold the hearing, apparently on the theory that the terms of supervised release could not be modified unless and until D'Amario violated the September 30, 2003 order. (11/9/05 Transcript at 9-10.) The court disagreed, citing precedent to the contrary. (Ibid. at 10-12.) The theory is not renewed in the present appeal (though appellate counsel has advanced a new jurisdictional claim).

Counsel then explained why D'Amario wished to reside in Rhode Island and asked the court to lift the travel ban. (11/9/05 Transcript at 12-28.) The court rejected that request, citing (a) D'Amario's previous and more recent threats of violence, (b) the need to protect public safety, (c) the need for close monitoring of his transition back into society, and (d) the inadequacy of electronic monitoring. (Ibid. at 16-18, 20-21, 29-31.)

In response, D'Amario's counsel proposed placing D'Amario in a halfway house in a neighboring state such as Massachusetts. (Ibid. at 33-34.) The court said the idea had merit and asked D'Amario to comment on it. (Ibid. at 34-35.) D'Amario addressed the court personally and listed the reasons why he would prefer to live in Rhode Island. (Ibid. at 35-41.) The court then noted that (a) the Coolidge halfway house in Boston would help prepare D'Amario for his return to Rhode Island, (b) the court might permit D'Amario to travel to Rhode Island on a limited basis to take care of certain business, and (c) the court might lift the travel ban entirely if it became satisfied that D'Amario was less of a security threat. (Ibid. at 41-42, 46-47.) D'Amario stated that he did not want to stay at a halfway house. (Ibid. at 44-46.)

After conferring with D'Amario, his counsel proposed in the alternative that he be permitted to reside with his parents in Arizona during the transitional period contemplated by the court. (Ibid. at 48-49.) The court replied that counsel's halfway house

proposal was more sensible because, with closer monitoring, the probation officer would be in a better position to make an assessment concerning "whether at some point during this supervised release period it makes sense for him to be allowed to return more regularly or more permanently to Rhode Island." (Ibid. at 50-51.) After conferring again with D'Amario, counsel stated that he still did not wish to live in a halfway house. (Ibid. at 51.)

The court ultimately ordered D'Amario to spend up to six months at the Coolidge halfway house in Boston. At counsel's request, however, the court agreed that (a) D'Amario could stay with his parents in Arizona under the supervision of the Arizona Probation Office for 60 days after his release, before reporting to the halfway house and (b) the court would hold a hearing within 90 days of his arrival at the halfway house, to assess whether he was ready to return to Rhode Island. (Ibid. at 51-52 & 54-61.) The court also noted that during this period D'Amario could seek permission to return to Rhode Island for specific purposes. (Ibid. at 60.)

At the end of the hearing, D'Amario addressed the court personally and renewed his counsel's threshold contention that the court lacked jurisdiction to modify the terms of supervised release. (Ibid. at 65.) The court reiterated the reasons for its order and warned D'Amario not to violate it. (Ibid. at 66.) The court signed a written order the same day. (Addendum at 14.)

D'Amario filed a timely notice of appeal. (Docket No. 389.) This Court assigned him appellate counsel for that appeal only.

**F. Subsequent Events**

In January 2005, the district court (Smith, J.) denied D'Amario's renewed request for permission to reside in Rhode Island. (Addendum at 15.) The court granted D'Amario's motion to modify the terms of his supervised release, however, in that it (a) permitted him to remain in Arizona for an additional 60 days and (b) ordered the Probation Office to study the feasibility of transferring supervised release to the District of Oregon. (Addendum at 16. ) D'Amario has since filed further district court motions and further notices of appeal. (Docket Nos. 404-429.)

D'Amario failed to report to the Coolidge halfway house. A warrant was issued for his arrest on March 31, 2005. (Docket No. 431.) Judge Smith recused himself from the case on April 7, 2005 (Docket No. 435), and the case was transferred back to the District of New Hampshire. (Docket Nos. 436, 437 & 442; Addendum at 17.) D'Amario is being held pending a supervised release revocation proceeding. (District of New Hampshire Case No. 1:99-cr-00030-PB, Docket Nos. 239-252.)

## III. SUMMARY OF ARGUMENT

1. Pursuant to 18 U.S.C. § 3583(e)(2) and Fed. R. Crim. P. 32.1(c), the district court plainly had jurisdiction to modify the terms of D'Amario's supervised release, notwithstanding the fact that he has a number of pending appeals in this Court, including appeals that target the earlier (pre-modified) supervised release order. The statute authorizes judges to make such modifications throughout the entire period of supervised release, irrespective of whether the defendant has a related pending appeal. Beyond the text of the statute, common sense dictates that judges must retain their authority to police supervised release issues during the pendency of an appeal, especially in an era when a year or more may elapse between the filing of a notice of appeal and the issuance of the mandate. No precedent holds to the contrary and a Ninth Circuit decision is closely on point.

2. D'Amario never argued below that the supervised release statute does not authorize community confinement, and thus review is for plain error. The two circuits that have addressed this question have rejected his position and this Court has not spoken on the issue, so there can hardly be a "plain" or "obvious" error for purposes of plain-error review. Moreover, there is no error at all because the majority view happens to be correct.

3. Given the facts of this case, including D'Amario's prior and more recent threats of violence and his stated intention to

violate a condition of his supervised release, the district court was amply justified in placing D'Amario in a halfway house. The court considered less restrictive options before imposing this condition. It also tailored the condition by adding several important caveats that made the condition less onerous and that allowed D'Amario potentially greater freedom. There was no abuse of discretion.

## IV. ARGUMENT

### A. THE DISTRICT COURT HAD JURISDICTION TO MODIFY THE TERMS OF SUPERVISED RELEASE

D'Amario no longer contends that a district court must wait for a violation to occur before convening a hearing to modify the terms of supervised release.[3] Instead, he makes a new claim to the effect that his earlier appeals -- several of which have been pending for well over a year despite the government's motions for summary disposition -- divested the district court of jurisdiction to alter any aspect of his supervised release. (Brief at 6-10.) He posits that the district court is powerless to act until this Court issues the mandates in these appeals. He is wrong.

Pursuant to 18 U.S.C. § 3583(e)(2) and Fed. R. Crim. P. 32.1(c), the district court plainly had jurisdiction to modify the

[3] That position is meritless in any event, as the district court concluded. See United States v. Lowenstein, 108 F.3d 80, 84-85 (6th Cir. 1997); United States v. Crea, 968 F. Supp. 826, 833 n.8 (E.D.N.Y. 1997).

terms of D'Amario's supervised release, notwithstanding the fact that he has a number of pending appeals in this Court, including appeals that target the earlier (pre-modified) supervised release order. The statute authorizes district courts to make such modifications throughout the entire period of supervised release, irrespective of whether the defendant has a related pending appeal. The statute provides in relevant part that a district court "may modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release." 18 U.S.C. § 3583(e)(2) (emphasis added). Whereas a district court's ability to revisit a criminal case is limited in other contexts, see, e.g., Fed. R. Crim. P. 33(b)(1), 18 U.S.C. § 3582(c), there are no such limitations here.

Beyond the text of the statute, common sense dictates that judges must retain jurisdiction to police a defendant's supervised release and to modify orders as circumstances change, whether or not an appeal is pending. Otherwise, a pending appeal would create a power vacuum and, potentially, a period of lawlessness. This concern is particularly acute in an era when a year or more may elapse between the filing of a notice of appeal and the issuance of the mandate. In light of the special oversight responsibilities of district courts and the probation officers who serve as arms of the court, see, e.g., United States v. Melendez-Santana, 353 F.3d 93, 101-03 (1st Cir. 2003), United States v. Bermudez-Plaza, 221 F.3d

231, 235 (1st Cir. 2000), it is absurd to think that Congress could have intended such a gap in authority to occur merely upon the filing of a notice of appeal. See United States v. Turkette, 452 U.S. 576, 580 (1981) ("absurd results are to be avoided").

Although the government has found no case directly on point (and D'Amario cites none), a case with close parallels to this one undermines D'Amario's position. See United States v. Phelps, 283 F.3d 1176, 1181 n.5 (9th Cir. 2002) (holding in case of insanity acquittee that district court retained jurisdiction to monitor and modify conditions of release under 18 U.S.C. § 4243(f), despite pending appeal, where statute allowed court to modify conditions at any later time); cf. United States v. Vanhorn, 296 F.3d 713, 721 (8th Cir. 2002) (district court retains jurisdiction to modify restitution order); United States v. Meyers, 95 F.3d 1475, 1489 n.6 (10th Cir. 1996) (district court retains jurisdiction to rule on motion for bail pending appeal); United States v. Hurley, 63 F.3d 1, 23-24 (1st Cir. 1995) (pointing out that divestiture rule is not absolute and holding that district court retains jurisdiction to modify restitution order).

Contrary to D'Amario's suggestions, there is little risk that concurrent jurisdiction will disrupt appellate review. Defendants can always move this Court for expedited consideration if they fear that the district court will modify a supervised release condition before this Court can address a pending appellate claim concerning

that same condition. Moreover, if a defendant is unhappy with an intervening modification of supervised release he can always file another appeal (as happened here). Conversely, if an intervening modification benefits the defendant, this may obviate the need for the earlier appeal altogether, in which case the defendant can move to dismiss it.

The latter point deserves separate mention. Defendants may well suffer from a rule which divests judges of jurisdiction, because in some cases judges may later wish to liberalize the conditions of release or to terminate release altogether. This case illustrates the point. In January 2005, while the present appeal and other D'Amario appeals were pending, the district court granted D'Amario's motion to modify the terms of his supervised release in that it (a) permitted him to remain in Arizona for an additional 60 days and (b) ordered the Probation Office to study the feasibility of transferring supervised release to the District of Oregon. (Addendum at 16.) By D'Amario's logic, the court was powerless to provide him with that benefit because his earlier notices of appeal had divested the court of jurisdiction.

The First Circuit case law cited by D'Amario does not suggest (much less require) a different result.

In United States v. Brooks, 145 F.3d 446 (1st Cir. 1998), this Court applied the divestiture rule in a radically different circumstance. In that case, a district court judge swore in a jury

and attempted to proceed with a criminal trial despite the government's interlocutory appeal of an order excluding critical evidence that it intended to present in its case-in-chief. Id. at 448 & 450-53. Not only was there no statutory authority for proceeding with the trial during the pendency of the appeal, but doing so would have effectively extinguished the government's appellate rights while creating potential double jeopardy issues. Brooks, 145 F.3d at 454 & n.4 and 455-56 & n.7. It is precisely in this sort of situation -- where there is no statutory authority to proceed and where proceeding could wreak havoc -- that it makes sense to apply the divestiture rule discussed in Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982).

Moreover, in invoking Brooks, D'Amario ignores the obvious procedural differences between criminal trials and supervised release. A criminal trial is typically a one-time event. It involves litigation of discrete allegations, culminating in a jury verdict and a judgment of conviction and sentence. There is seldom any reason for a judge to reconsider trial or sentencing issues once an appeal has been filed. By contrast, supervised release aims at a moving target. With the help of probation officers, judges are expected to address fluid circumstances. Their authority derives from an open-ended statutory scheme under which they are expressly authorized to revisit and modify their earlier orders at any time prior to the expiration of the sentence -- that

is, until the very last day of the term of supervised release and even beyond in some cases. 18 U.S.C. § 3583(i). That is why it is called "supervised" release. There is simply no comparison between the two procedural settings.

D'Amario's reliance on United States v. DiStasio, 820 F.2d 20 (1st Cir. 1987), is misplaced for similar reasons. DiStasio presented the question of whether a judge could revisit and reduce a sentence under former Fed. R. Crim. P. 35(b) after the defendant filed a notice of appeal. Id. at 23. This Court concluded that the judge could not do so during the pendency of the direct appeal, relying on the general divestiture rule. Id. The critical distinction is that DiStasio did not involve a free-standing statutory scheme that expressly provides for monitoring and modifications throughout the entire life of the sentence. The character of this responsibility and its open-ended nature ("at any time . . .") make it fundamentally different from the act of imposing the original sentence or awarding a one-time sentence reduction.[4]

---

[4] The Second Circuit's decision in United States v. Ransom, 866 F.2d 674 (2d Cir. 1989) (per curiam), is also inapposite. Ransom did not involve a judge's power to modify the conditions of supervised pursuant to 18 U.S.C. § 3583(e)(2) during the pendency of an appeal. Rather, a few days after the defendant filed the notice of appeal in Ransom, the judge issued an amended judgment of conviction and sentence in which it eliminated the supervised release term entirely and made other substantive changes to the original sentence. Id. at 575-76. There is no sign that the court made these changes after holding a hearing pursuant to § 3583(e)(2).

In an apparent attempt to make his proposed rule seem more palatable, D'Amario suggests that a district court judge who desires to modify a defendant's conditions of supervised release while an appeal is pending need only move this Court to have the case remanded on a limited basis for this purpose. (Brief at 9.) There are two problems with that suggestion. First, there is no authority that the government is aware of for a judge to file such a motion in the Court of Appeals or for this Court to order such a remand, notwithstanding D'Amario's citation to current Fed. R. Crim. P. 33(b)(1) and former Fed. R. Crim. P. 35(b). (Brief at 9.) Second, and more importantly, a rule requiring a judge to petition this Court for a limited remand before holding a supervised release modification hearing would defeat the judicial flexibility contemplated by 18 U.S.C. § 3583(e)(2). Again, this case illustrates the point. Shortly before D'Amario was released from prison, Judge Smith learned that he had threatened acts of violence and intended to return to Rhode Island in violation of the terms of his supervised release. By D'Amario's logic, Judge Smith was powerless to stop that from happening and was required instead to first move this Court for a remand. That is surely not what Congress intended when it said that a judge "may modify, reduce, or enlarge the conditions of supervised release, <u>at any time</u> prior to the expiration or termination of the term of supervised release." 18 U.S.C. § 3583(e)(2) (emphasis added).

Finally, D'Amario's argument proves too much. D'Amario appears to concede that a pending appeal of a supervised release order would not divest the district court of jurisdiction to revoke supervised release entirely pursuant to 18 U.S.C. § 3583(e)(3). (Brief at 7 n.3.) D'Amario fails to explain why modifications of the same orders should be treated differently. In both situations, the judge's action directly affects a matter that is pending on appeal. In fact, in the case of revocation, the original supervised release order challenged on appeal may disappear entirely if the defendant is reimprisoned for the balance of his term of supervised release. Even a partial revocation of supervised release will inevitably produce a new (modified) supervised release order which governs the remaining period of supervised release after the defendant finishes serving the new prison term. Why, then, does the greater power not include the lesser power? D'Amario never says.

In sum, this Court should reject D'Amario's jurisdictional argument. It should issue a decision which leaves no doubt about the authority of district court judges to police supervised release matters during the pendency of appeals.

## B. THE DISTRICT COURT DID NOT PLAINLY ERR OR ABUSE ITS DISCRETION IN ORDERING COMMUNITY CONFINEMENT

### 1. The Statute Authorized Community Confinement

D'Amario now argues that under 18 U.S.C. § 3583(d), district courts are not authorized to impose community confinement as a condition of supervised release. (Brief at 10-12.) He never made any claim like this below. Indeed, it was his own attorney who first proposed the halfway house idea. (11/9/05 Transcript at 33-35.) Although trial counsel later retreated from the proposal after conferring with D'Amario, neither he nor D'Amario ever challenged the statutory authority for ordering community confinement. Instead, they merely stated that D'Amario did not wish to be placed in a halfway house and that he preferred to find housing in Rhode Island; in the alternative, he desired to extend his stay in Arizona. (11/9/05 Transcript at 35-41, 44-46, 48-49 & 51.)

At best, then, review is for plain error. United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). Under this standard, D'Amario must establish "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id.

D'Amario cannot satisfy the first two prongs of the test because community confinement is in fact an authorized condition of supervised release and because, in any event, it is certainly not

"plain" or "obvious" that the contrary is the case. Unless this Court gives "lip service to plain error review," United States v. Padilla, 393 F.3d 256, 259 (1st Cir. 2004) (Judges Campbell and Selya concurring), rehearing en banc granted, 2005 WL 789424 (1st Cir. Mar. 15, 2005), opinion vacated, 2005 WL 789505 (1st Cir. Apr. 7, 2005), the standard alone requires affirmance.

Here is why. The Eighth and Ninth Circuits have rejected the precise argument made by D'Amario and have held that community confinement is an authorized condition of supervised release under 18 U.S.C. § 3583(d). See United States v. Griner, 358 F.3d 979, 982 (8th Cir. 2004); United States v. Bahe, 201 F.3d 1124, 1136 (9th Cir. 2000); cf. Loeffler v. Menifee, 326 F. Supp.2d 454, 459-60 (S.D.N.Y. 2004) (finding reasoning of Bahe persuasive in different context); Benton v. Ashcroft, 273 F. Supp.2d 1139, 1144-45 (S.D. Cal. 2003) (same). Although the Sentencing Commission has expressed uncertainty on this point in view of a clerical issue (discussed below), the guidelines nonetheless provide for the imposition of community confinement as a discretionary condition of supervised release. See USSG §§ 5D1.3(e)(1) and 5F1.1. One district court has reached a contrary result. See United States v. Mills, 186 F. Supp.2d 965, 967-70 (E.D. Wis. 2002).[5]

---

[5] D'Amario also cites United States v. Barrett, 198 F. Supp.2d 1046 (S.D. Iowa 2002), but Barrett is no longer good law within the Eighth Circuit in light of Griner -- a decision that D'Amario fails to address.

At best, then, there is a split of authority, with the majority view favoring the government's position. This Court has not addressed the issue. Under these circumstances, there can be no claim of a "plain" or "obvious" error at the time of appellate review. See United States v. Whab, 355 F.3d 155, 158 (2d Cir.) ("an error cannot be deemed 'plain,' in the absence of binding precedent, where there is a genuine dispute among the circuits"), cert. denied, 124 S. Ct. 2055 (2004); United States v. Diaz, 285 F.3d 92, 97 (1st Cir. 2002) (where law on issue was unsettled in First Circuit and other circuits were split, error could not be deemed "plain"); see generally Johnson v. United States, 520 U.S. 461, 468 (1997) (error must be plain "at the time of appellate consideration"); United States v. Olano, 507 U.S. 725, 734 (1993) ("[a]t a minimum, [a] court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law"). Indeed, this case is easier to decide than Diaz and Whab because no circuit court has disagreed with the decisions in Griner and Bahe; those cases compete only with a lone district court decision.[6]

---

[6] Other First Circuit decisions have employed a Diaz-like plain-error analysis. See United States v. Gilberg, 75 F.3d 15, 22 (1st Cir. 1996); United States v. Weiner, 3 F.3d 17, 24 n.5 (1st Cir. 1993).

D'Amario's argument fails under the first prong of the plain-error test as well because, as it happens, the majority view is correct.

Separate statutes govern probation and supervised release. Probation conditions are set forth in 18 U.S.C. § 3563. Supervised release conditions are set forth in 18 U.S.C. § 3583(d). Supervised release is the newer of the two regimes. See generally Gozlon-Peretz v. United States, 498 U.S. 395, 395-403 (1991) (explaining origins of supervised release); United States v. Mandarelli, 982 F.2d 11, 12 (1st Cir. 1992) (explaining key differences between probation and supervised release).

When Congress enacted the supervised release provisions of § 3583(d) as part of the Sentencing Reform Act of 1984, the statute allowed judges to impose as discretionary conditions of supervised release "any condition set forth as a discretionary condition of probation in section 3563(b)(1) through (b)(10) and (b)(12) through (b)(19)." 18 U.S.C. § 3583(d) (1984). At the time, one of the referenced subsections of the probation statute, (b)(12), allowed judges to order a probationer to "reside at, or participate in the program of, a community corrections facility for all or part of the term" of probation. 18 U.S.C. § 3563(b)(12) (1984). Thus, no one doubts that Congress originally intended that judges would be permitted to order community confinement as a condition of

supervised release. See Bahe, 201 F.3d at 1131. It is later legislation that gives rise to the issue on appeal.

In 1996, Congress enacted sweeping new changes to Title 18 with the Antiterrorism and Effective Death Penalty Act, of which the Mandatory Victims Restitution Act ("MVRA") was a part. See generally United States v. Cheal, 389 F.3d 35, 46 (1st Cir. 2004). Under the MVRA, Congress "amended the discretionary conditions of probation listed in § 3563(b) by removing one subsection and renumbering those that remained; as a result, the community-confinement subsection shifted from (b)(12) to (b)(11)." Griner, 358 F.3d at 981-82. The issue on appeal arises from the fact that, "[s]ince the renumbering, Congress has not changed the reference in § 3583(d) to subsection (b)(12), and § 3583(d) continues to omit any reference to subsection (b)(11), although § 3563(b)(11) is now the subsection allowing a court to require a probationer to reside in a community-corrections facility." Griner, 358 F.3d at 982.

As the Griner court held, however, the subsequent renumbering of § 3563(b) does not change the meaning of § 3583(d) in light of a settled canon of statutory construction. Griner, 358 F.3d at 982. The Supreme Court has described that canon as follows:

> A well settled canon tends to support the position of respondents: "Where one statute adopts the particular provisions of another by a specific and descriptive reference to the statute or provisions adopted, the effect is the same as though the statute or provisions adopted had been incorporated bodily into the adopting statute. * * * Such adoption takes

> the statute as it exists at the time of adoption and does not include subsequent additions or modifications by the statute so taken unless it does so by express intent." The weight of authority holds this rule respecting two separate acts applicable where, as here, one section of a statute refers to another section which alone is amended.

Hassett v. Welch, 303 U.S. 303, 314 (1938) (quoting 2 Sutherland on Statutory Construction, 787-88 (2d ed. 1904)) (footnotes omitted) (emphasis added).

One hundred years before Hassett, the Supreme Court recognized this rule of interpretation and explained the logic behind it:

> It was not an uncommon course of legislation in the states, at an early day, to adopt, by reference, British statutes: and this has been the course of legislation by congress in many instances where state practice and state process has been adopted. And such adoption has always been considered as referring to the law existing at the time of adoption; and no subsequent legislation has ever been supposed to affect it. And such must necessarily be the effect and operation of such adoption. No other rule would furnish any certainty as to what was the law; and would be adopting prospectively, all changes that might be made in the law. And this has been the light in which this Court has viewed such legislation.

Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 625 (1838) (emphasis added); accord Munoz v. Porto Rico Ry. Light & Power Co., 83 F.3d 262, 266-67 (1st Cir. 1936).

Applying the Sutherland formulation of the rule to the question at issue in the present case, the Griner court reasoned:

> When enacted by Congress § 3583(d) adopted "particular provisions" of § 3563(b) by

> "specific and descriptive reference," and therefore we believe that it was as if the language of those subsections was made a part of § 3583(d). In this way, § 3583(d) included the language of subsection (b)(12) as it was then written to permit community-corrections confinement. Although Congress has renumbered the subsections of § 3563(b), Congress has not re-enacted § 3583(d) since then, and we have not located (nor have defendants pointed us to) anything in the statutes or legislative history to indicate that Congress has removed from § 3583(d) the community-confinement condition that was incorporated into the statute when it was passed. For these reasons, we believe that § 3583(d) continues to include community-corrections confinement as a discretionary condition of supervised release, and we conclude that the district court did not commit error, plain or otherwise, when it imposed that condition here.

Griner, 358 F.3d at 982 (emphasis added); compare Crown Construction Co. v. Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor, 887 F.2d 149, 152-54 (8th Cir. 1989) (canon did not apply where reference to other statute was general and not specific).

If more were needed, Bahe explains in detail why the failure to update the numbering in § 3583(d) was likely a clerical oversight and why legislative history makes clear that Congress has always intended community confinement to be a discretionary condition of supervised release. Bahe, 201 F.3d at 1125-26 & 1128-36. As Bahe observes, "[n]othing in the text or legislative history of the MVRA or § 3563 suggests that Congress intended to alter the conditions that a sentencing court may attach to a term

of supervised release under § 3583(d)." Id. at 1131. In particular, there is no "indication that Congress ever intended the MVRA to exclude or eliminate a sentencing court's authority to confine a defendant to a community treatment center as a condition of his or her supervised release." Id. at 1131-32. The Bahe court reasoned that "if Congress intended to abandon a discretionary condition of supervised release that had been the law for over twelve years, surely it would have mentioned this intent somewhere in the legislative history. It did not." Id. at 1132. Bahe also explains why Congress deliberately omitted reference to former (b)(11) when it enacted § 3583(d) in 1984. Id. at 1132-33.

The case that D'Amario relies upon fails to address the canon of statutory construction discussed in Griner. Mills, 186 F.Supp.2d at 967-71. It relies instead on the following syllogism: (1) because the supervised release statute still refers to subsection (b)(12) of the probation statute while continuing to omit reference to (b)(11), and (2) because (b)(12) has since been renumbered as (b)(11), Congress must have intended to jettison community confinement as a condition of supervised release, even though it retained it as a condition in the renumbered probation statute. Id. That is obviously not the case and the canon noted above demonstrates why it is hazardous to impute such an intent to Congress, particularly where there was no contemporaneous renumbering of the supervised release statute and there is no

obvious policy reason why community confinement makes sense for probation but not for supervised release.

D'Amario makes a perfunctory argument based on subsequent legislation "introduced in 2001" -- legislation that he never identifies. (Brief at 12.) He must be referring to the bill discussed in Mills. Mills, 186 F. Supp.2d at 970. Apparently that bill would have clarified the numbering issue so that § 3583(d) would refer to the new (b)(11) instead of the old (b)(12). Id. Oddly, the Mills court saw the bill as an implicit concession by Congress that it had originally precluded community confinement as a supervised release condition. Id. The exact opposite inference, however, is the more natural one. And in any event, it unclear what weight should be placed on subsequent, un-enacted bills concerning a bookkeeping item that inexplicably fell through the cracks between the House Judiciary Committee and the House floor. Id.

2. Community Confinement was Reasonable in this Case

D'Amario argues that even if the statute permits community confinement as a discretionary condition of supervised release, the condition was not appropriate in his case because, according to him, it was not justified under the statutory criteria in 18 U.S.C. § 3583(d)(1)-(3), discussed in United States v. York, 357 F.3d 14, 20 (1st Cir. 2004). (Brief at 13-16.)

There was no objection along these lines below (though D'Amario made a general objection to the halfway house proposal that his counsel had initially raised), and thus arguably review is for plain error only. The standard of review makes no difference, however, because it is clear in any event that the district court did not abuse its discretion. York, 357 F.3d at 19.

A court may order a discretionary condition of supervised release "to the extent that such condition - "

> (1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);
>
> (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and
>
> (3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a) . . .

18 U.S.C. § 3583(d)(1)-(3). D'Amario makes no developed argument concerning the last of these prongs, no doubt because there is no conflict whatever between the challenged condition and the relevant guideline policy statements. See USSG §§ 5D1.3 and 5F1.1. Instead, his brief appears to be based on the first two prongs. (Brief at 14-15.)

Under the first prong, the discretionary condition must be "reasonably related" to one or more of the factors listed in the referenced subsections of 18 U.S.C. § 3553. In pertinent part, the four main factors are: (1) "the nature and circumstances of the

[original] offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B); (3) "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C); and (4) "to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D). Under the second prong, the condition imposed must result in "no greater deprivation of liberty than is reasonably necessary" to advance one or more of these goals. 18 U.S.C. § 3583(d)(2).[7] The district court's order satisfies each prong.

The halfway house condition was designed in part to ensure D'Amario's compliance with the earlier condition that he not travel to Rhode Island during the period of his supervised release. At the November 9, 2004 hearing, the district court explained that it had imposed that earlier condition "because [D'Amario] has engaged in such a campaign of threats and harassment of so many different people in Rhode Island that I felt there was no other way to really effectively protect and assure myself about the public safety issues associated with him once he was released unless I could put some type of parameter that would effectively deal with it." (11/9/04 Transcript at 16.)

---

[7] To the extent that D'Amario argues that the condition of supervised release must serve all four goals, he is wrong; one alone suffices. <u>York</u>, 357 F.3d at 20.

The court's assessment of D'Amario also took place against the backdrop of his original crimes -- possession of a firearm as a convicted felon and threatening to kill the judge who sentenced him. See York, 357 F.3d at 17 & 21 (noting that in light of statutory language quoted above, facts of "underlying offense and criminal history are pertinent to the district court's choice of supervised release conditions," and holding that defendant's "proven recidivism" was relevant to factor of "protecting the public from further crimes").

But what precipitated the November 9 hearing was that the court had been presented with evidence that D'Amario had threatened new acts of violence while in prison and had stated unequivocally that he intended to return to Rhode Island in violation of the original order. The court discussed that evidence in vivid detail at the hearing. (11/9/04 Transcript at 7-8, 12, 16-18, 32.) D'Amario made no serious challenge (if any at all) to the evidence underlying these concerns, and he makes no such challenge on appeal.

Prior to issuing its halfway house ruling, the court commented on (a) D'Amario's previous and more recent threats of violence, (b) the need to protect public safety, (c) the need for close monitoring of his transition back into society, and (d) the inadequacy of electronic monitoring. (11/9/04 Transcript at 16-18, 20-21, 29-32.) Ironically, it was this discussion that prompted

D'Amario's own counsel to propose the halfway house condition. (Ibid. at 33-34.) In response to D'Amario's stated preference to reside in Rhode Island, the court noted that (a) the Coolidge halfway house would help prepare D'Amario for his return to Rhode Island, (b) the court might permit D'Amario to travel to Rhode Island on a limited basis to take care of certain business, and (c) the court might lift the travel ban entirely if it became satisfied that D'Amario was less of a security threat. (Ibid. at 41-42, 46-47.)

Although the court considered the less restrictive alternative of allowing D'Amario to reside with his parents in Arizona (in addition to considering the electronic monitoring option just mentioned), it concluded that the halfway house setting was more appropriate because, with closer monitoring, the probation officer would be in a better position to make an assessment concerning "whether at some point during this supervised release period it makes sense for him to be allowed to return more regularly or more permanently to Rhode Island." (Ibid. at 50-51.) That reasoning makes perfect sense. D'Amario fails to address it in his brief.

Finally, the court tailored its order by adding the following caveats. First, at counsel's request, the court agreed that (a) D'Amario could stay with his parents in Arizona under the supervision of the Arizona Probation Office for 60 days after his release, before reporting to the halfway house and (b) the court

would hold a hearing within 90 days of his arrival at the halfway house, to assess whether he was ready to return to Rhode Island. (Ibid. at 51-52 & 54-61.) Second, the court also noted that during this period D'Amario could seek permission to return to Rhode Island for specific purposes. (Ibid. at 60.)[8]

In sum, the district court's order satisfies each of the contested prongs of 18 U.S.C. § 3583(d). There was no flaw in the modification, let alone an abuse of discretion.

## V. CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

UNITED STATES OF AMERICA,

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

DONALD C. LOCKHART
Bar No. 62470
ADI GOLDSTEIN
Assistant U.S. Attorneys

---

[8] Although the written order does not spell out all these details (Addendum at 14), it is settled that the oral judgment controls. See Melendez-Santana, 353 F.3d at 100.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I, Donald C. Lockhart, certify that the word processing system of the Office of the United States Attorney states that this document (excluding the table of contents, the table of authorities, the certificate of compliance, and the certificate of service) contains 7,550 words.

DONALD C. LOCKHART
Assistant U.S. Attorney
Bar No. 62470

## CERTIFICATE OF SERVICE

I hereby certify that on this the 2nd day of May, 2005, I served two copies of the within Appellee-United States' Brief, by first-class mail, postage prepaid to:

Judith Mizner, Esq.
Federal Defender Office
408 Atlantic Ave, 3rd Floor
Boston, MA 02210

**ADDENDUM**

**TABLE OF CONTENTS**


| | Page |
|---|---|
| Report and Recommendation, July 16, 2003, CR 99-024ML (RI), CR 99-30-01M (NH) . . . . . . . . . . . . . | 1 |
| Order, November 9, 2004, CR. No. 99-024-01S . . . . . . . . . . . . . . . . . . . . . . . | 14 |
| Motion to Modify Supervised Release Terms, December 15, 2004; Order Denying Motion, January 12, 2005, No. CR 99-024S . . . . . . . . . . . . . . | 15 |
| Order, January 13, 2005, CR No 99-024S . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| Order, April 12, 2005, CA04-328S [RI]; Concurring Order, 05-ds-142-PB [NH] . . . . . . . . . . . . . | 17 |

RECEIVED JUL 18 U.S. ATTORNEY DISTRICT OF RI

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

v. CR 99-024ML (RI)
CR 99-30-01M (NH)

ARTHUR D'AMARIO, III

REPORT AND RECOMMENDATION

Robert W. Lovegreen, United States Magistrate Judge

This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) and 18 U.S.C. § 3401(i) for proposed findings of fact concerning whether the defendant is in violation of the terms of his supervised release and, if so, to recommend a disposition of this matter. In compliance with that directive and in accordance with 18 U.S.C. § 3583(e) and Fed.R.Civ.P. 32.1, a preliminary probation violation hearing was held on June 6, 2003, at which time defendant, through counsel and personally, denied that he was in violation of his supervised release as to the charged violations. An evidentiary hearing was held on June 17, 2003 at which time the Chief United States Probation Officer for the District of Rhode Island and the defendant testified. Based upon the following analysis of the testimony and the applicable law, **I recommend that defendant be committed to the Bureau of Prisons for a term of eleven (11) months of incarceration in both criminal matters, the terms to run concurrently. I further recommend that this term of incarceration be followed by a term of supervised release of twenty five (25) months in each criminal matter, the terms to run concurrently. Lastly, I recommend that the following special conditions be re-imposed or imposed on the defendant as part of his supervised release conditions in each criminal matter: (1) the defendant shall participate in a mental health program for evaluation and/or treatment as directed by the United States Probation Office, and shall remain in treatment until satisfactorily discharged and with the approval of the United States Probation Office; (2) the defendant shall have no oral or written contact with any government officials or civil litigants without prior consent from the United States Probation Office and the Court; and (3) the defendant is prohibited from returning to Rhode Island during the period of supervised release without permission from the United States Probation Office and the Court.**

## Background

As to CR 99-24ML, in March 2000, subsequent to his conviction on a charge of Felon in Possession of a Firearm, a Class C felony, the defendant was sentenced by District Judge Joseph DiClerico, Jr., sitting by designation, to an eighteen (18) month term of incarceration and a following three (3) year term of supervised release. Special conditions for mental health treatment and a no contact order with agencies that have a no contact order was entered.

As to the second case in the District of New Jersey, CR 01-346, in April 2002, subsequent to a conviction on a charge of Threatening to Assault a Federal Judge, a Class D felony, the defendant was sentenced by District Judge Joseph Irenas to a twenty-seven (27) month term of incarceration followed by a three (3) year period of supervised release. The court imposed special conditions for mental health treatment, no oral or written contact with any government officials or civil litigants without prior consent of the probation office, and full financial disclosure. In July 2002, the period of incarceration was reduced to twenty-one (21) months due to a reduction in the criminal history category.

In both cases, supervised release was to commence on April 29, 2003 and terminate on April 28, 2006 and to run concurrently.

## Discussion

Following his conviction in the District of New Jersey, the defendant was sent to FCI McKean in Bradford, Pennsylvania to serve his term of incarceration. In August 2002, the defendant, with the assistance of an inmate case manager, completed a release plan concerning his supervision after he was released from incarceration. See Exhibit 3. That document, signed by the defendant and by his case manager, Brian Henry ("Henry"), states: "In accordance therewith, I submit the following as my plans for the service of the remainder of my sentence under supervision. Pursuant to my sentence, I must report in person to the United States Probation Office within 72 hours of my release." Also, the defendant stated: "Inmate D'Amario has requested a relocation of supervision to the District of Arizona." The document lists his residence to be with his mother in Green Valley, Arizona.

At the evidentiary hearing, Chief Probation Officer Barry Weiner ("Chief Weiner") testified that, while incarcerated, each inmate is assigned a case manager who discusses release plans with the inmate. A release plan is prepared and signed by the

inmate and the case manager.

A Progress Report dated the same day as the release plan states as follows:

> RELEASE PLANNING: Inmate D'Amario has indicated he plans to reside with his parents in the Green Valley, Arizona area upon his release from incarceration.

Exhibit 4 at p. 3.

The Progress Report also states his address at his mother's home, the name and address of the probation officer in the sentencing district (New Jersey) and the name and address of the probation officer in the relocation district (Arizona).

In October 2002, the District of Arizona Probation Office approved the defendant's release plan which required that he live in Green Valley, Arizona with his parents. The approval also concurred in FCI McKean's recommendation that the defendant be placed in a Community Corrections Center prior to his release from incarceration. Thereafter, the defendant was placed in the New Directions Treatment Center in Tucson, Arizona. See Exhibit 6.

In February 2003, the defendant wrote a letter which was forwarded by the District of Arizona Probation Office to the District of Rhode Island Probation Office wherein the defendant stated that it was his intention to return to Rhode Island upon his release from incarceration. This prompted a written response from Chief Weiner to the defendant dated March 28, 2003. This letter was provided to the defendant by the Arizona Probation Office on April 3, 2003 and the defendant signed a receipt for the letter. See Exhibit 6. In that letter, Chief Weiner noted the defendant's release from incarceration date of April 29, 2003 and the commencement of the two concurrent three year terms of supervised release. Chief Weiner reminded the defendant of his release plan calling for his release in Arizona and supervision by the District of Arizona Probation Office. He also advised the defendant that there were formal procedures for seeking a transfer of his supervised release to another District and that leaving Arizona for any reason without approval from the probation officer was not authorized and would constitute a serious violation of the conditions of his supervised release. Chief Weiner also explained in great detail the procedure for requesting a transfer and advised a consultation with the defendant's probation officer in Arizona if he desired to seek a

transfer.

In response, the defendant wrote to Chief Weiner on April 11, 2003 stating that he would "be back in Rhode Island on April 30, and will check in with your office on May 1. If you don't like the idea of me living there, then you can move." See Exhibit 7 at p. 2. On April 14, 2003, the defendant left a voice mail on the District of Rhode Island Probation Office's telephone stating he was in Arizona and that on April 30, 2003 he would fly to Rhode Island to live there. He intended to apply for and receive approval for Section 8 housing and "[t]here are no alternatives, no other options. I am returning home to Rhode Island on April 30." See Exhibit 8 at p. 1. In response, on April 14, 2003, Chief Weiner informed the District of Arizona Probation Office and requested that the defendant again be instructed that his supervised release is in Arizona and any departure therefrom without approval is unauthorized and a serious violation of the conditions of his supervised release.

On April 17, 2003, the defendant wrote to Chief Weiner again stating he would return to Rhode Island on April 29 or 30. See Exhibit 9. The Bureau of Prisons removed the defendant from home confinement (with his parents) and placed him back into the halfway house as a regular resident.

On April 21, 2002, the halfway house, New Beginnings Treatment Center, wrote to the defendant concerning a grievance he filed on April 19, 2003 which requested a return to home confinement. The defendant was informed, among other issues, that he would be released to the Green Valley, Arizona address as his release plan indicated and that his home confinement was revoked due to his statements that he was returning to Rhode Island immediately upon his release from incarceration. See Exhibit 10.

On April 22, 2003, the defendant received a letter written by the District of New Jersey Probation Office stating that his release plan called for release in Arizona and supervision by the District of Arizona Probation Office. In addition, the defendant was informed "[t]his letter is to serve as a reminder that you are not permitted to travel outside of the district of your release without the permission of the probation office in that district or the sentencing Court. Should you fail to comply with this condition of supervised release, your case will be returned to Court for violation proceedings." See Exhibit 11.

In April 2003, the District of Arizona Probation Office presented to the defendant a document entitled Clarification of

Supervision Conditions to be read and, if necessary, discussed with the defendant. The defendant refused to sign the document writing on it "I decline to sign until the court determines which district will supervise me. (Signed) A. D'Amario." See Exhibit 12. That document did state under the heading "TRAVEL", "Travel outside the District (State) of Arizona requires written permission and must be for good cause and consistent with the purposes of supervision."

Earlier, in late March 2003, the defendant filed in the District Court for the District of New Jersey a Motion to Modify Supervised Release Condition pursuant to 18 U.S.C. § 3583(e)(2) which was denied without prejudice on April 30, 2003. District Judge Irenas, noting that the defendant desired to return to Rhode Island and that there was a Rhode Island criminal matter which had ordered a term of supervised release, stated that the Rhode Island federal court was the appropriate jurisdiction to handle any requests for modification to the terms and conditions of the supervised release as it had the first criminal matter and the defendant had ties to Rhode Island and not New Jersey. Judge Irenas specifically stated in his Order that:

> Both the Rhode Island and New Jersey judgments provide that Mr. D'Amario, upon his release, should report to the Probation Office in the district in which he is released - which is clearly Arizona. Both judgments also provide that Defendant shall not leave the "judicial district" without the permission of the Court or Probation Officer. The phrase "judicial district" is not specifically defined. However, the only sensible reading is that it refers to the district to which Defendant is released.
>
> If Defendant wishes to change the place of residence provided for during release planning with the BOP, there is a proper procedure to follow. He should apply for such change to the Tucson, Arizona Probation Office. They will forward it to Rhode Island Probation which will make a recommendation to the judge assigned to the case. That judge will then make a determination as to whether to accept or reject whatever recommendation is made by the Probation Officer on the Defendant's request.

(5)

Exhibit 13 at ¶¶ 5 and 6.

According to the notes of the Arizona probation officer, on May 28, 2003, he spoke with the defendant on the telephone and informed him that he was not authorized to travel outside the District of Arizona and, specifically, he had no permission to travel to New Jersey. The defendant responded that he would not stay in Arizona and was planning on relocating to New Jersey. The Arizona probation officer again advised the defendant that permission to travel outside Arizona was denied. See Exhibit 14.

On June 2, 2003, Chief Weiner was advised by the New Jersey probation officer that the defendant was in New Jersey and that he was being arrested pursuant to an arrest warrant issued by District Judge McAuliffe.

Subsequently, the jurisdiction over the New Jersey criminal matter was transferred by Judge Irenas to Rhode Island with the consent of Judge McAuliffe. Currently, Rhode Island has the jurisdiction to hear any matters involving alleged violations of each term of supervised release.

The defendant testified at the June 17, 2003 hearing that in August 2002 he was approached at FCI McKean by a case worker with a form for a release plan and he wrote out his release address and signed it. He stated that his release address was Six White Dove Trail, Smithfield, Rhode Island. Hearing Tr. at 71. The next day, the case worker returned stating he had a better idea which was that he could go to Arizona and obtain more halfway house time and an opportunity to look for public housing. The case worker suggested the release plan for Arizona with the defendant's parents. The defendant stated that he was told by the case worker that on April 29, 2003, the date his supervised release commenced, that he could inform the Arizona probation officer that his release would be back to Rhode Island. Id. at 72. With that understanding, he signed the release plan and this was discussed on numerous occasions with the case worker and his supervisor both of whom assured him that he had only to indicate he wanted to be released to Rhode Island.

The defendant testified that in Arizona the probation officer told him there was no need for mental health treatment there as Rhode Island would handle that condition when he returned to Rhode Island. Id. at 75-76. After supervised release was commenced, the defendant testified he "explained" the situation to the Providence and Tucson probation offices and he had his New Jersey public defender file a motion with the New Jersey federal court seeking to return to Rhode Island. Id. at

(6)

77. A similar motion was filed pro se in Rhode Island. He has lived in Rhode Island his whole life and has no contacts with Arizona or New Jersey. He had no understanding that his release plan would require he stay in Arizona permanently during his term of supervised release. He stated that he believed his release plan (Exhibit 3) was blank when he signed it. Id. at 83. The address was filled in later.

The defendant testified that in late May 2003, his parents returned from an extended trip to Rhode Island and his father had been drinking and was very abusive to him. Id. at 89. He did not seek another residence in Arizona, but, instead, on June 1, 2003, he flew to Philadelphia, ostensibly to hear an oral argument on a matter involving him in the Third Circuit. This was unsuccessful and he then went to Camden, New Jersey to the courthouse and entered the probation office. He was arrested shortly thereafter.

On cross-examination, the defendant admitted that the signatures on Exhibits 1-14 that purport to be his are in fact his signatures. Id. at 93. He admitted that no federal judge in Arizona gave him permission to leave Arizona and no federal judge in New Jersey, Rhode Island or New Hampshire ever gave him permission to leave Arizona. Id. at 97. He also admitted that no Arizona probation officer gave him permission to leave Arizona. Id. at 98. And no New Jersey or Rhode Island probation officer ever gave him permission to leave Arizona. Id.

The defendant also testified that he never intended to kill or hurt a federal judge or anyone else. The reason he wrote the letter (Exhibit B) was to be sent to solitary confinement as he disliked the job he was then assigned to at the federal prison. Id. at 103-05.

Following the hearing on June 17, 2003, the parties submitted legal memoranda to this court on the issue of the authority of any court or Probation Office to place the defendant under supervised release in Arizona. Neither memorandum cited to any relevant law. The defendant cited to United States v. Fuller, 211 F. Supp. 2d 204 (D. Me. 2002). That case is inapposite. There, the defendant had filed a Motion for Transfer of Supervised Release while still in the custody of the Bureau of Prisons. The district court denied the motion stating that it was premature to decide such a motion before the term of supervised release commenced. Id. at 206. The government cites to United States v. Ohler, 22 F.3d 857 (9th Cir. 1994). Ohler concerns the transfer of probation jurisdiction. Ohler was convicted in Arizona and placed on probation and his probation

was supervised in Oregon where he lived. The court stated that "[h]is probation was supervised in Oregon, but jurisdiction over his probation remained in the District of Arizona." Id. at 858. While on probation in Oregon, Ohler was convicted of a separate offense. Thereafter, the Arizona federal court transferred the probation jurisdiction to the Oregon federal court which accepted the transfer. By doing this, any revocation of probation proceeding could be held in Oregon where Ohler was living and being supervised. Ohler attacked the transfer of his probation jurisdiction from Arizona to Oregon without notice to him and a hearing. He lost. The government cites to this case to demonstrate the difference between jurisdiction over the criminal matter and supervision over the defendant following release from incarceration.

This difference between jurisdiction over the criminal matter and the supervision over the defendant following release from incarceration is at the very crux of the instant matter. Based upon the testimony and the exhibits in this matter and the applicable law, there is a very vital difference. Here, there are two criminal matters, one in Rhode Island and one in New Jersey. Both courts have jurisdiction over the criminal matter in that court, but this does not mean that the Probation Office in each federal court must supervise the defendant's release. The testimony here is abundantly clear that the term of supervised release ordered by the Rhode Island federal court did not commence before the defendant committed the criminal act in New Jersey. Both federal courts ordered, as part of the sentence, that the defendant receive three years of supervised release and the New Jersey federal court ordered that the terms of supervised release be served concurrently. However, the supervision of the defendant upon release from incarceration is determined by the United States Probation Office ("USPO"). This testimony is quite clear that the process involves the inmate and a case worker during incarceration when the inmate prepares and files a release plan for approval by the USPO. While normally, the inmate requests the district (state) where he lived at the time of the criminal act, the inmate is free to request any district (state) provided he has an adequate basis to do so. The plan is then reviewed by the USPO and, if approved, becomes effective upon release from incarceration. Here, the evidence is overwhelming that the defendant selected Arizona as his place of supervised release as he had parents living there and no residence in Rhode Island to return to. This defendant's testimony that he understood the release plan to apply only to a halfway house and not supervised release is rejected as totally incredible. The evidence is totally opposed to such a conclusion. The defendant obviously regretted his request for



8

Arizona, but that did not change the fact that, at his request, he was released to Arizona. While his supervision was with the Arizona Probation Office, any violations of the conditions of supervised release would be heard in a federal court in either New Jersey, Rhode Island, or both, as these courts retained jurisdiction to hear and decide any violations. When the New Jersey federal court transferred its jurisdiction to the federal court in Rhode Island and the federal court in Rhode Island accepted that transfer, then only the federal court in Rhode Island had jurisdiction to hear and decide any violation charges. And the evidence is abundantly clear that if this defendant wished to relocate from Arizona to New Jersey, Rhode Island, or any other district, there is in place a procedure for him to apply to the Arizona Probation Office to accomplish that. Such a transfer would require the approval of the Arizona Probation Office and the approval of the Probation Office in the new district (state). Without question, this defendant failed to receive any such approval even though he was advised many times by various sources that such approval was essential before relocation or there would be a serious violation of the supervised release conditions. This defendant simply ignored the known and established procedures.

After reviewing the testimony and exhibits in this matter, I find that the defendant is in violation of the terms and conditions of his supervised release as follows:

**Violation # 1 - Condition # 1 - The defendant shall not leave the judicial district without permission of the court or probation officer.**

On or about June 2, 2003, the defendant had left his district of supervision, Arizona, and traveled to New Jersey without the prior permission of the probation office or any federal court.

**Violation # 2 - Condition # 3 - The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.**

On March 28, 2003, the defendant was instructed in writing by the Rhode Island Probation Office that he was not to leave Arizona during his term of supervised release without the prior permission of the probation office or any federal court. On or about

June 2, 2003, he traveled to New Jersey without such permission.

**Violation # 3 - Condition # 3 - The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.**

On April 22, 2003, the defendant was instructed in writing by the New Jersey Probation Office that he was not to leave his district of release (Arizona) during his term of supervised release without the prior permission of the probation office or any federal court. On or about June 2, 2003, he traveled to New Jersey without such permission.

**Violation # 4 - Condition # 3 - The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.**

On April 29, 2003, the defendant was verbally instructed by the Arizona probation officer that he was not to leave Arizona without the prior permission of the probation officer or federal court. On or about June 2, 2003, he traveled to New Jersey without such permission.

Recommended Disposition

Title 18 U.S.C. § 3583(e)(2) provides that if the court finds defendant violated a condition of supervised release, the court may extend the term of supervised release if less than the maximum authorized term was previously imposed. Here, the maximum term of supervised release was previously imposed in each case so that an extension is unavailable.

Title 18 U.S.C. § 3583(e)(3) provides that the Court may revoke a term of supervised release and require the defendant to serve in prison all or part of the term of supervised release authorized by statute without credit for time previously served on post release supervision, except that a defendant may not be required to serve more than two years if the offense for which supervised release was ordered is a Class C or Class D felony.

The underlying felonies here were a Class C and a Class D felony. Consequently, the defendant may not be required to serve more that 2 years imprisonment upon revocation for each of these cases, for a total of 4 years imprisonment.

Section 7B1.1(a)(3) of the United States Sentencing Guidelines ("USSG") provides that conduct constituting (A) a federal, state or local offense punishable by a term of imprisonment of one year or less; or (B) a violation of any other condition of supervision is classified as a **Grade C Violation**. The defendant's violations constitute a Grade C violation as they are in violation of the conditions of supervision. The court may not extend supervised release, but may revoke or modify supervision.

Section 7B1.4(a) of the USSG provides that the criminal history category is the category applicable at the time the defendant originally was sentenced to a term of supervision. The presentence report for the Rhode Island case (CR 99-024ML) indicates that a **criminal history category of III** applied at the original sentencing. The presentence report for the New Jersey case (CR 01-346) indicates that **a criminal history category of IV** applied at sentencing. Section 7B1.4(a) of the USSG also provides that for a Grade C violation with a Criminal History category of III, an imprisonment range of **5-11 months** is warranted. Section 7B1.4(a) of the USSG also provides that for a Grade C violation with a Criminal History category of IV, an imprisonment range of **6-12 months** is warranted.

Section 7B1.3(c)(1) of the USSG provides that where the minimum term of imprisonment determined under § 7B1.4 is at least one month, but not more than six months, the minimum term may be satisfied by (A) a sentence of imprisonment; or (B) a sentence that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in § 5C1.1(e) for any portion of the minimum term.

> **5C1.1(e) Schedule of Substitute Punishments:**
>
> (1) One day of community confinement (residence in a community treatment center, halfway house, or similar residential facility) for one day of imprisonment.
>
> (2) One day of home detention for one day of imprisonment.

This section is applicable to this case, but is not recommended

by this court as community confinement or home detention in Rhode Island or Arizona is inappropriate for this defendant.

Section 7B1.3(c)(2) of the USSG provides that where the minimum term of imprisonment determined under § 7B1.4 is more than six months but not more than 10 months, the minimum term may be satisfied by (A) a sentence of imprisonment; or (B) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in § 5C1.1(e), provided that at least one-half of the minimum term is satisfied by imprisonment. This section is inapplicable to this defendant.

Section 7B1.3(g)(2) of the USSG provides that where supervised release is revoked and the term of imprisonment imposed is less than the maximum term of imprisonment imposable upon revocation, the defendant may, to the extent permitted by the law, be ordered to recommence supervised release upon the completion of his imprisonment. The length of such a term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release. The statutory maximum term on each of the original offenses was three years supervised release. There has been no previous term of imprisonment imposed for supervised release violations so the maximum term for supervised release, less any term of imprisonment imposed here, is available to the court.

Section 7B1.5(b) of the USSG provides that, upon revocation of supervised release, no credit shall be given toward any term of imprisonment ordered, for time previously served on post-release supervision.

It is beyond dispute that the evidence demonstrates that this defendant, although instructed not to do so and was informed as to the proper procedures for transfer of his supervised release, intentionally left Arizona without prior permission and went first to Pennsylvania and then New Jersey. His testimony in this matter was disingenuous and, in this court's opinion, totally incredible. Further, he continues to state that he will live in Rhode Island with or without permission.

## Conclusion

After considering the various factors set forth in 18 U.S.C. § 3553(a), I recommend that defendant be committed to the Bureau of Prisons for a term of eleven (11) months of incarceration in

(12)

both criminal matters, the terms to run concurrently. I further recommend that this term of incarceration be followed by a term of supervised release of twenty five (25) months in each criminal matter, the terms to run concurrently. Lastly, I recommend that the following special conditions be re-imposed or imposed on the defendant as part of his supervised release conditions in each criminal matter: (1) the defendant shall participate in a mental health program for evaluation and/or treatment as directed by the United States Probation Office, and shall remain in treatment until satisfactorily discharged and with the approval of the United States Probation Office; (2) the defendant shall have no oral or written contact with any government officials or civil litigants without prior consent from the United States Probation Office and the Court; and (3) the defendant is prohibited from returning to Rhode Island during the period of supervised release without permission from the United States Probation Office and the Court.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court and the right to appeal the district court's decision. United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

Robert W. Lovegreen
United States Magistrate Judge
July 16, 2003

(13)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA )
)
v. ) Cr. No. 99-024-01S
)
ARTHUR D'AMARIO )

ORDER

Pursuant to a hearing on November 9, 2004, and in accordance with Rule 32.1(c) of the Federal Rules of Criminal Procedure and Title 18, United States Code, §3583(e)(2), the conditions of supervised release, as ordered by this Court on September 30, 2003, are amended to include the following additional special condition:

Within seventy-two hours of release, the defendant shall report to the United States Probation Office for the District of Arizona for a period of courtesy supervision, not to exceed sixty days. Upon completion of courtesy supervision, the defendant shall participate in a community confinement program at the Coolidge House Comprehensive Sanctions Center in Boston, Massachusetts, for a period not to exceed six months. As an additional condition of supervision, the defendant shall comply with all program rules and regulations and comply with all staff instructions relevant to said program.

Per Order,

Deputy Clerk

Enter:

William E. Smith
United States District Judge

Date: 11/9/04

14

385

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES

v.

No. CR 99-024S

ARTHUR D'AMARIO

MOTION TO MODIFY SUPERVISED RELEASE TERMS

Pursuant to Title 18, Section 3583, Defendant moves to modify the special condition of supervised release prohibiting him from entering the district, so that he may move into an apartment in Smithfield on or about Jan. 12, 2005. Defendant requests the appointment of attorney Charles Tamuleviz under Section 3006A to assist with this motion, and refers the court to his attached memorandum.

DEFENDANT, PRO SE,

[signature] 12-15-04
Arthur D'Amario III
1488 W. Camino de la Oca
Green Valley, AZ 85614

CERTIFICATION

I certify that on Dec. 15, 2004, I mailed copies of this Motion & Memorandum to AUSA Adi Goldstein, 50 Kennedy Plaza, Prov., RI 02903; and to Charles Tamuleviz, 144 Westminster St., Prov., RI 02903.

[signature]
defendant, pro se

Motion Denied

WMS, USDJ
1/12/05

15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| United States of America, Plaintiff, | : | |
| v. | : | CR No 99-024S |
| Arthur D'Amario, III, Defendant. | : | |

## ORDER

The Defendant's Motion to Modify Release Conditions is granted in part as follows:

1. Defendant shall be allowed to remain in Arizona (subject to the willingness of the Office of Probation for the District of Arizona to continue supervision) for an additional 60 days.

2. During this 60 day period the Office of Probation will investigate the Defendant's request to transfer supervision to the District of Oregon.

3. The Government may object to the modification of Defendant's term of supervised release at any point it deems appropriate.

4. Defendant is ordered to supply U.S.P.O. Brian Pletcher with all information deemed necessary by Mr. Pletcher relating to Defendant's request.

ORDER:

By: [signature]
Deputy Clerk

ENTER:

[signature]
William E. Smith
U.S. District Judge
Date: 1/13/05

16

U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

APR 15 11 51 AM '05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RECEIVED
APR 28 2005
U.S. ATTORNEY
DISTRICT OF R.I.

Arthur D'Amario,
Plaintiff

v.

CA04-328S
05-ds-142-PB

United States of America,
Defendants

## ORDER

All of the judges in the District of Rhode Island are recused from presiding over this case. Accordingly, the case shall be transferred to the District of New Hampshire.

The recusal of all of the judges of this court gives rise to an "emergency" with respect to the transferred case as that term is used in 28 U.S.C. §636(f). I therefore concur in the assignment of a magistrate judge from the District of New Hampshire to perform the duties specified in 28 U.S.C. §636(a) - (c).

SO ORDERED.

By Order:

Deputy Clerk

ENTER:

Chief Judge Ernest C. Torres
date: 4/12/05

## Concurring Order

I concur that an emergency exists as specified in the above and that for the duration of this case Magistrate Judge Muirhead is assigned to perform such duties under 28 U.S.C. §636(a) - (c) as may be assigned to him/her by the District Judge to whom this case is assigned.

Chief Judge, Assignee District

17

**UNITED STATES COURT OF APPEALS**

**FOR THE FIRST CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Appellee, | ) | |
| v. | ) | No. 04-2566 |
| ARTHUR D'AMARIO,<br>Defendant-Appellant. | ) | |

**APPELLEE-UNITED STATES' EMERGENCY MOTION FOR EXPEDITED DECISION**

At yesterday's oral argument, this Court asked the government to report the outcome of the supervised release revocation proceeding held before Chief Judge Young that same morning. Judge Young provisionally: (1) revoked supervised release; (2) sentenced D'Amario to a year in prison; and (3) imposed a new 13-month term of supervised release which includes as a special condition four months of community confinement at the Coolidge Halfway House. Judge Young said that the ruling is provisional because he himself will decide the question of whether Judge Smith earlier had jurisdiction to modify the conditions of release despite the pending appeals. The government informed Judge Young that this precise issue is before this Court. Judge Young said he was aware of that and that if this Court issued a decision on that point he would follow the decision and not reconsider the issue himself.

The government has spent a considerable amount of time on this and other D'Amario cases. Two of the issues presented in this appeal -- the jurisdictional issue and the question whether the

supervised release statute authorizes community confinement -- are important and may well recur in future cases. The government therefore requests that the Court issue a published opinion on those issues.

However, in view of Judge Young's stated intent to address the jurisdictional issue unless this Court does so first, and the havoc that this could cause if Judge Young determines that Judge Smith earlier lacked jurisdiction, the government also requests that this Court issue a brief ruling on that issue within a week, along with a statement that its ruling will be followed by a published decision that more fully explains why it has reached that result. Judge Young has ordered the government to brief the jurisdictional issue by Friday, June 17, and he has said that he will issue a ruling shortly after that. That is why the government seeks expedited treatment of the present motion.

Lack of decisive action on this matter will only send a message that D'Amario may continue to tie the federal judiciary up in knots. He needs to be stopped.

Respectfully submitted,

UNITED STATES OF AMERICA,

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

DONALD C. LOCKHART
Bar No. 62470
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on this, the 9th day of June, 2005, I mailed and faxed a true copy of this filing to:

Judith Mizner, Esq.
Federal Defender Office
408 Atlantic Ave, 3rd Floor
Boston, MA 02210